# STATE OF NORTH DAKOTA, Respondent, v. CHARLES AL-TON, Appellant.

(208 N. W. 835.)

**Intoxicating liquors — evidence held to sustain conviction for possession of intoxicating liquor.**

The defendant was convicted of the crime of having intoxicating liquors in his possession. The evidence showed that certain premises belonging to a mining corporation were searched under a search warrant and the material, which the defendant was charged with possessing, was found, the defendant and another being present at the time. The defendant was the superintendent of the mine, in connection with which the premises searched had been used for a dwelling. The evidence is examined and it is held sufficient to support the verdict and judgment.

Opinion filed May 1, 1926.

Intoxicating Liquors, 33 C. J. § 505 p. 761 n. 53.

Appeal from the District Court of Williams County, *Moellring,* J. Affirmed.

*Fisk, Craven & Taylor,* for appellant.

*Geo. F. Shafer,* Attorney General, and *Ernest A. Francis,* State's Attorney, for respondent.

BIRDZELL, J. This is an appeal from a judgment of conviction and from an order denying the defendant's motion for a new trial. The defendant was charged with the crime of having intoxicating liquors in his possession, the information alleging that he had in his possession "five cases home brewed beer containing more than $\frac{1}{2}$ of 1 per cent of alcohol by volume, 2 packages of hops, $\frac{1}{2}$ pound of yeast, 1 tub, 1 sack of empty bottles, 1 rubber tube, 1 small funnel, 134 pints of beer not in cases, 67 quarts of home brew beer not in cases, $\frac{1}{2}$ quart bottle of beer, all of said beer containing more than $\frac{1}{2}$ of 1 per cent of alcohol by volume, and said beer being used for beverage purposes." It appears from the evidence that on May 1, 1925, materials answering substantially the above description were found by the sheriff of Williams county in a room of a small house situated upon land owned by the Williston

Coal & Mining Company and which was used in connection with the operation of a coal mine, the defendant being the superintendent of the mine. The only contention upon this appeal is that the evidence is insufficient to support the judgment of conviction. The testimony is not voluminous and may be abstracted as follows: The sheriff testified that on May 1, 1925, he went upon the premises in question, armed with a search warrant authorizing the search of the quarter section upon which the mine and various buildings were located; that he went to the building that was the foreman's office and discovered there substantially the materials mentioned in the information. The building searched was a shack of two rooms, divided in the center, with a door between, the rooms being about 10 x 12 or 12 x 14. Both rooms were not used as an office, the south room only being the office. The room in which the materials were found is the north room. When he went to the building the defendant was in the south room and opened the door to let him in. The witness told the defendant that he had a search warrant. The defendant told him to go ahead. The witness went into the back room and found the stuff. After the discovery of the beer, there was some conversation between the witness and Alton. The witness, testifying concerning the same, said: (Answer) "Well, he says, I don't know just his words, but he said it was funny that all that could be in his office and him not know it. He seemed surprised that it was there. And I says, don't try to hand me that kind of bunk. I said we get this every day, and it don't have much effect on us. And we proceeded to load it up. That is about all the conversation we had. There was not very much said." (This is followed by considerable testimony offered to prove the alcoholic content of the beer, concerning which no question is raised on this appeal.) On cross-examination this witness testified that he thought there was some kind of a cot, a table and a couple of chairs in the south room of the shack. He didn't recall anything else. He called the place the defendant's office, because "he told me it was." "There was very little, if anything, in the place that would indicate it was an office." When he went in there was another man in the room besides the defendant, one Floyd Holman who used to work at the mine. The outer or south door of the shack was locked when the witness got there. He tried the door and it didn't open. Asked again what the defendant said after the beer was found, the

witness answered "Well I think he, as near as I can remember he said, don't it beat hell that this stuff could be here right in my office, and me not know it?" In rebuttal this witness testified that as they were leaving the premises he, the defendant, "turned around to be sure that that door didn't lock, because he said, I have forgotten who, but he said there was some tools in there that somebody was liable to come after while he was in town, and as he had the only key to it why he would not be able to get them. That is what I remember about the lock at that time." The witness did not remember that the defendant had said he had the key with him. He was not attempting to repeat the exact words of the defendant but only the substance of what he understood. At the same time the defendant asked the witness if he was going to lock up the shed under the search warrant.

Witness Dawson testified that he was secretary and treasurer of the Williston Coal & Ice Company. The defendant's residence and office were in another building on the premises and not in the building where the stuff was found. The dwellings were let to employees, rent being charged from the first of September to the first of April, and from the first of April to the first of September the employees were allowed to remain rent free, if they desired. The defendant never occupied the building in question to the knowledge of the witness, either as a dwelling or as an office. The last tenant prior to May 1st was Floyd Holman. The witness had not been on the premises for months prior to May 1st. The defendant is competent and industrious and the matter of his being a law-abiding citizen had never been questioned.

Witness Huseby testified that he was president of the Williston Coal & Ice Company; that the building in question, prior to May 1, 1925, was used for a dwelling; it was vacant part of the time; the company's office was not in that building at that time; the company maintained no office at the mine; that the reports were generally made out at the tipple or at the mouth of the mine. The last tenant of the house in question was Floyd Holman. So far as he knew the defendant never had had possession of the house in question. The defendant had charge of the mine and looked after the "workings" at a salary of $200 per month and had a good reputation as a law-abiding citizen.

The defendant testified that he was forty-two years of age; that he had been married in 1915 and had six children; that he lived in one of

the houses at the mine; that he had been foreman of the mine since September 16, 1921. He never at any time occupied the building in which he was present at the time it was searched by the sheriff and he never at any time kept his office in that building or called it his office; that the last person who occupied it was Floyd Holman; that he never had any more control over that building than over the rest of the vacant buildings at the mine; that at the time the sheriff came the door was unlocked. He did not have a key to the door. On being asked as to the conversation between himself and the sheriff, witness answered: "Well, sir, Mr. Marshall come in the door and he says he had a search warrant for the place, and I told him all right, to go ahead; and I think that is all that was said just then. He went in the back room and found some stuff and he says it was here, and I just forget the exact words but I have got them pretty close I guess. I believe I said it was a hell of a note that stuff was in this place and I knew nothing about it. And he says, don't give me any bunk like that." He had never called the place his office. He was positive of that. He had been in the back room ten days before. He had hooked the back door and come out and closed the front door. He had not been in the back room since. He had nothing to do with any of this stuff and did not have possession of it. The company telephone at the mine was in his house and he had a desk in the house. In the front room of the premises in question there was a dining table, a bed, a mattress and a couple of chairs. These belonged to Floyd Holman. Witness knew nothing about who manufactured the stuff in question. On the day in question the witness had been working on the fence and was taking the car to take the children to a picnic. He had some tools in the car and opened the front door of the shack and threw the tools in. Fred Holman drove in and wanted to get some of the stuff (furniture) he had there and the defendant and Holman were standing there and the defendant then bought from Holman everything he had there. "It just happened" that he and Holman met there. He was not drinking that day. He and Holman were good friends. He didn't know that Holman had any beer. Holman didn't ask him if he wanted a drink. At the time he bought Holman's stuff he didn't go into the other room, as all he had was in the front room. Holman had told him so. The defendant had not been in this house for about ten days prior to May 1st. There

might have been some old magazines in the house. He put some in there about ten days before, just a couple of magazines. At that time he looked in the back room but there was not anything there.

The above is substantially all of the testimony on the subject of the possession by the defendant of intoxicating liquors. It will be noted it is established that he was the superintendent of the mine; that he exercised some degree of authority over the house in question some ten days before the date of the search, at the time he closed the doors; that Holman had moved out, although apparently leaving some of his furnishings in the house; that the defendant had left some magazines there; that at the time the search was made he was present in this small house of two rooms with the former occupant, with whom he was on friendly terms; that though a rather formidable array of brewing materials and a copious supply of finished product was found he professed to be absolutely unaware of its existence. We are of the opinion that there are circumstances shown which would warrant a jury in going beyond the verbal denials of the defendant and finding contrary to them. While the evidence of guilt is not strong, we think it cannot be said, in light of the circumstances shown, that the jury was not warranted in finding that the defendant was in possession of the contraband material.

The judgment is affirmed.

CHRISTIANSON, Ch. J., and BURKE, JOHNSON, and NUESSLE, JJ., concur.